ORIGINAL

AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

FILED
CLERK, U.S. DISTRICT COURT

FEB 1 5 2019

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| 8308 Morrill Avenue, Whittier, California ("SUBJECT PREMISES 1") | ) Case No. 2:19mj00548 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371; 18 U.S.C. § 922(a)(1)(A); 21 U.S.C. § 846 and 21 U.S.§ 841(a)(1). | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

LODGED

2019 FEB 15

_____
*Applicant's signature*

Ryan Stearman, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/15/19

_____
*Judge's signature*

City and state: Santa Ana, CA

~~Honorable Autumn D. Spaeth,~~ U. S. Magistrate Judge
*Printed name and title*

KAREN E. SCOTT

AUSA: Nare:sks

## AFFIDAVIT

I, Ryan Stearman, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since September 2005.  I am currently assigned to the ATF Los Angeles Field Division, Santa Ana Field Office.  In the course of my employment as an ATF Special Agent, I have assisted in and conducted numerous investigations involving criminal street gangs, possession of firearms by prohibited persons, possession of stolen firearms, possession of machineguns, and the illegal distribution of firearms and narcotics.  I have also participated in numerous federal and state search and arrest warrants involving individuals engaged in conspiracies to unlawfully traffic and possess firearms and narcotics. Additionally, I have participated in the seizure of records and other types of evidence that documents activities in both firearms trafficking and the manufacturing and distribution of controlled substances.

2.   To conduct these investigations, I have used a variety of investigative techniques and resources, including physical surveillance, wire interceptions, search warrants, interviews, the utilization of undercover agents and informants, and the review of various databases and records.  I have also received training during the course of my employment as an ATF Special

- 1 -

Agent in various topics, including but not limited to, illegal trafficking of firearms, the utilization of informants, the activities of criminal street gangs, asset forfeiture, and conducting surveillance and wire interceptions. Through these investigations, my training and experience, and conversations with other experienced agents and law enforcement personnel, I have become familiar with the methods used by traffickers to smuggle, safeguard, distribute, and store firearms and narcotics, and to collect and launder related proceeds.

3. I have conducted investigations involving the possession and use of firearms by prohibited persons, as well as investigations dealing with the possession, manufacturing, distribution, and importation of controlled substances. I have also conducted and participated in investigations related to the possession, manufacturing, and trafficking of firearms, in violation of Titles 18 and 26 of the United States Code. As an ATF agent, I have also participated in more than one hundred controlled purchases of firearms and narcotics, including methamphetamine, marijuana, cocaine, and heroin, using confidential informants and undercover agents. I have conducted and participated in investigations utilizing search warrants, undercover agents, informants, and wiretap interceptions resulting in the seizure of several pounds of methamphetamine, as well as smaller quantities of ecstasy, heroin and cocaine.

//

//

- 2 -

## II. PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of the following:

a.    A criminal complaint charging ROBERT OCHOA ("OCHOA") and MARCOS CHACON ("CHACON") with distribution of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii), as well as associated arrest warrants;

b.    An application for a warrant to search OCHOA'S residence;

c.    An application for a warrant to search CHACON's residence; and

d.    An application for a warrant to search OCHOA'S vehicle.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PREMISES TO BE SEARCHED

6.    The residences to be searched are:

a.    The residence located at 8308 Morrill Avenue, Whittier, California ("SUBJECT PREMISES 1");

- 3 -

b.    The residence located at 11127 Wheelock Street, Whittier, California ("SUBJECT PREMISES 2" and collectively with SUBJECT PREMISES 1, the "SUBJECT PREMISES"); and

c.    A silver 2013 Honda Civic bearing California license plate 7BTL760 ("SUBJECT VEHICLE 1").

7.    The SUBJECT PREMISES and the SUBJECT VEHICLE are further described in attachment A.  The list of items to be seized is set forth in Attachment B.  Attachments A and B are incorporated herein by reference.

## IV. ITEMS TO BE SEIZED

8.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a license); 21 U.S.C. § 846 (conspiracy to distribute controlled substances); and 21 U.S.C. § 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances) (the "Subject Offenses"), as set forth more fully in attachment B, which is incorporated herein by reference.

## V. STATEMENT OF PROBABLE CAUSE

9.    I am the lead ATF special agent assigned to the investigation of ROBERT OCHOA and MARCOS CHACON.  Between July 2018 and October 2018, OCHOA sold (or was involved in the sale of) methamphetamine and firearms to a confidential informant

("CI") and an ATF undercover agent ("UC") on seven occasions.[1] Between November 2018 and January 2019, CHACON sold methamphetamine and firearms to the UC on four separate occasions after having been introduced to the UC by OCHOA.

10.    The above-described transactions with OCHOA and CHACON were audio and video recorded, and I have reviewed all recordings made during this case.[2] As the lead ATF agent, I have also directed and participated in the controlled purchases of firearms and methamphetamine from OCHOA and CHACON.  I have reviewed reports prepared by the UC and discussed with the UC the events of the controlled purchases.  For the transaction involving the CI, I debriefed the CI regarding the events of the transaction.  Brea Police Department ("BPD") Detective Miguel Ojeda acted as the CI handler and provided me with information obtained from the CI regarding OCHOA.  I have also reviewed the contraband purchased during the course of the investigation.

11.    Unless otherwise stated, the facts set forth below are based on the sources of information described in paragraph 10.

_____

[1] During the course of the investigation of OCHOA and CHACON, the CI was given consideration for a pending state criminal violation.  The CI has no felony convictions.  The CI also has three misdemeanor convictions, which involve fraud, weapon possession, possession of narcotic paraphernalia, receiving stolen property, and obstruction.

[2] The video recording device unexpectedly malfunctioned on the November 14, 2018 methamphetamine transaction described herein, however an audio recording of this transaction was obtained.  The UC provided a detailed written report of events that occurred during this transaction.

A.   **July 3, 2018: OCHOA Sells Methamphetamine to UC at SUBJECT PREMISES 1**

12.   Prior to July 3, 2018, the CI, at the direction of law enforcement, arranged for the UC to purchase methamphetamine from OCHOA during a series of unrecorded telephone calls and documented text message exchanges.

13.   On July 3, 2018, the UC drove with the CI to OCHOA'S home (SUBJECT PREMISE 1).  Inside the garage of SUBJECT PREMISE 1, prior to any introductions, the UC observed OCHOA holding a clear plastic bag containing what appeared to be methamphetamine.  When the CI introduced the UC to OCHOA and asked if OCHOA could take care of the UC, OCHOA responded, "Yeah, don't trip."  OCHOA then looked at the UC and said, "I'll fuck with you," meaning OCHOA would sell the UC methamphetamine. The UC confirmed that OCHOA had four ounces of methamphetamine to sell, and OCHOA responded, "Yeah four" and OCHOA told the UC it would cost $680.  The UC exchanged the money for the four ounces of methamphetamine.  OCHOA also told the UC that he sells cocaine too before the two started to discuss firearms.  OCHOA informed the UC that OCHOA had an associate who was making AR-type firearms but was arrested after the associate was caught selling a different ATF UC firearms on several prior occasions. Before departing, OCHOA provided the UC a business card for custom clothing and embroidery with OCHOA'S name on it.  OCHOA then instructed the UC to obtain OCHOA'S cellular telephone number from the CI so that the UC could call OCHOA in the future for the purchase of narcotics.  The telephone number the CI used

to contact OCHOA was (909) 222-8793 (hereinafter referred to as the "909 number").

14.   Following the transaction, OCHOA departed SUBJECT PREMISES 1 driving SUBJECT VEHICLE 1.[3]

15.   On July 5, 2018, the UC initiated a text message to the "909 number" to thank OCHOA for selling the methamphetamine two days earlier.  The UC received the response, "Fo sho."

16.   I, along with the UC, have reviewed OCHOA's DMV record, and have confirmed that, based on my review of the video recording, the individual who participated in this transaction matches OCHOA's DMV photograph.

17.   According to a Drug Enforcement Administration ("DEA") laboratory report, the substance sold by OCHOA was approximately 113 grams of 100 percent pure methamphetamine.

18.   The CI did not participate in any further controlled purchases with OCHOA or CHACON.

**B.   July 13, 2018: OCHOA Sells Methamphetamine to the UC**

19.   In the days leading up to July 13, 2018, OCHOA and the UC communicated via recorded telephone calls and text messages so that OCHOA could sell the UC four ounces of methamphetamine. OCHOA communicated with the UC using the "909 number."  When asked if OCHOA could sell the UC another four ounces of

---

[3] On August 1, 2018, a federal search warrant (SA 18-418M) authorizing the installation and use of a GPS tracking device on SUBJECT VEHICLE 1 was authorized by the Honorable Karen E. Scott in the Central District of California.  On September 12, 2018, the Honorable John D. Early authorized an extension of this warrant to obtain GPS tracking information for an additional 45 days.

methamphetamine, OCHOA responded, "Yeah, yeah I got it.  Fool .
. . . I always got it my boy."

20.   On July 13, 2018, the UC met OCHOA in the parking lot
of the Cheesecake Factory in Brea, California.  Once the UC
arrived in the parking lot, OCHOA exited SUBJECT VEHICLE 1
holding a clear and blue plastic bag and opened the passenger
door to the UC's vehicle.  OCHOA placed the bag, containing the
methamphetamine, on the passenger seat of the UC's vehicle.  The
UC, in turn, provided OCHOA $680 for the methamphetamine.

21.   According to a DEA laboratory report, the substance
sold by OCHOA was approximately 111.55 grams of 100 percent pure
methamphetamine.

## C.   August 21, 2018: OCHOA Sells Methamphetamine to UC

22.   Preceded by a series of recorded telephone calls and
text messages, the UC met with OCHOA again in the parking lot of
the Cheesecake Factory in Brea, California on August 21, 2018 in
order to purchase a pound of methamphetamine from OCHOA.  OCHOA
communicated with the UC using the "909 number."

23.   Once the UC arrived in the parking lot and parked next
to SUBJECT VEHICLE 1, OCHOA waved the UC over to SUBJECT VEHICLE
1.  After the UC entered SUBJECT VEHICLE 1, and the two
exchanged greetings, OCHOA handed the UC the pound of
methamphetamine concealed in a chip bag.  After providing the UC
the methamphetamine, OCHOA stated, "I can get straps[4] fool . . .

---

[4] Based on my training and experience, I know that "Straps"
is common street vernacular for firearms.  I have heard this
term used by dozens of suspects during UC recordings in my

but I've been paying like eight,[5] fool." OCHOA further stated to the UC that OCHOA can acquire firearms new in the box, and that the price will be in the range of $800-$1,000. During this purchase of methamphetamine in OCHOA's car, OCHOA removed a Smith & Wesson two-tone .40 caliber pistol from his waistband to show the UC.

24. The UC then provided OCHOA $2,200 in exchange for the one pound of methamphetamine. OCHOA then returned to speaking about firearms with the UC. OCHOA stated, "Sometime they come new in the box, sometimes they don't, but they're all like pretty br, they're all like brand new, you know?" OCHOA also told the UC that OCHOA buys firearms too. During this conversation, OCHOA again mentioned to the UC that OCHOA had a friend that was arrested after selling firearms to a different ATF UC.

25. The UC then asked OCHOA if the UC could see the pistol OCHOA moments earlier had shown the UC. OCHOA agreed, but cautioned the UC, "It's loaded too, so . . . if you pull it, there's one in the trigger." OCHOA then ejected the magazine from the pistol before handing it over to the UC, who offered to purchase the firearm from OCHOA. However, OCHOA declined the offer and told the UC that "this is my gun." When the UC made a comment about OCHOA having the gun to protect himself while dealing drugs, OCHOA responded, "Most definitely. Hell yeah,

---

investigations, as well as during post-arrest interviews with suspects.

[5] This is a reference to $800.

got to." OCHOA told the UC that OCHOA would call the UC when he had a firearm to sell the UC.

26. Before separating, the UC asked OCHOA about additional quantities of methamphetamine OCHOA may be able to sell to the UC. OCHOA stated, "If you want five [pounds], I can get you five. Whatever you want. Anything you want, I got that shit . . . Usually we'll . . . get like probably ten [pounds] at a time." OCHOA continued to explain, "When we get 'em, we get a few of them . . . when those are gone, the next ones . . . we get a stack, and it'll be the same, but then the next stack will be different," referring to shipment quantities of methamphetamine. OCHOA then pointed to the chip bag containing the methamphetamine that he had provided the UC and said, "But this, I got all day, this, all day, all day . . . ."

27. According to DEA laboratory report, the substance sold by OCHOA was approximately 446 grams of 98 percent pure methamphetamine.

**D.    September 5, 2018: OCHOA Sells Stolen Firearm to UC**

28. Beginning on August 22, 2018, OCHOA engaged in numerous recorded telephone calls and text message exchanges with the UC wherein OCHOA was offering to sell the UC firearms. OCHOA communicated with the UC using the "909 number." One of the firearms OCHOA offered to sell the UC was a Glock .45 caliber pistol.

29. Ultimately on September 5, 2018, the UC agreed to meet OCHOA in a Shakey's Pizza parking lot located in Whitter, California (a short distance from SUBJECT PREMISES 1). When the

UC arrived, OCHOA walked from a nearby warehouse[6] to the UC
vehicle carrying a black bag.  SUBJECT VEHICLE 1 was parked
outside the warehouse.  OCHOA entered the UC vehicle and began
conversation with the UC by explaining that since OCHOA'S friend
was "busted" by ATF, OCHOA would prefer to meet at the UC's
residence for the next transaction.  OCHOA then explained to the
UC again that he had a friend that was arrested for selling guns
to an ATF UC.  The UC explained that the UC would like to
purchase more methamphetamine in the near future, to which OCHOA
responded, "Whatever you want my boy."  When asked about the
maximum quantity, OCHOA replied, "Whatever you need, we could
make it happen . . . if you're wanting to go over five [pounds],
then at least give me a day ahead.  But I mean, if you want
like, like five right now, fool we can make that shit happen."

30.  OCHOA then opened up the black bag that was lying on
the floor board near his feet for the UC to see the Glock pistol[7]
contained within the bag.  The UC provided $1,000 to OCHOA for
the pistol.  The UC asked OCHOA about purchasing narcotics from
OCHOA right then, but OCHOA replied that he does not like to
sell firearms and narcotics at the same time.  The UC stated
that he/she would contact OCHOA soon to purchase more narcotics,
and OCHOA replied, "Whenever you're ready."

31.  Following this transaction, I conducted a query in
NCIC of the serial number on the Glock pistol OCHOA sold the UC.

---

[6] OCHOA previously utilized a warehouse adjacent to the
Shakey's Pizza restaurant parking lot.

[7] The firearm is fully described as a Glock, Model 21, .45
caliber pistol bearing serial number KYS815.

I learned that the firearm OCHOA sold the UC had been reported stolen on June 30, 2018 in Mesa, Arizona.

>    **E.     September 25, 2018: OCHOA introduces CHACON to the UC During the Sale of Methamphetamine and a Stolen Firearm at SUBJECT PREMISES 2**

32.   During September 2018, the UC engaged in a series of recorded telephone calls, as well as an exchange of several text messages, with OCHOA arranging the purchase of at least one firearm and a pound of methamphetamine from OCHOA.  These calls and messages from OCHOA were from the "909 number."

33.   On September 25, 2018, the UC agreed to meet OCHOA in the parking lot of a Denny's restaurant in Whittier, California. Prior to meeting the UC, OCHOA called the UC and stated that he was going to introduce the UC to "my boy" so that the UC could start dealing with this new individual because OCHOA was "super busy."  OCHOA also confirmed for the UC that the firearm that OCHOA would sell him on this date would be the Smith & Wesson pistol OCHOA previously had during the August 21st transaction.

34.   After waiting approximately 20 minutes, OCHOA arrived by himself driving a white Toyota Corolla.  OCHOA instructed the UC to follow OCHOA to a residence (SUBJECT PREMISES 2) nearby. OCHOA led the UC to the alley directly behind SUBJECT PREMISES 2.  After greeting the UC, OCHOA led the UC into the backyard of SUBJECT PREMISES 2 through a wooden gate in the alley.  Once in the backyard, OCHOA introduced the UC to CHACON by stating, "So you'll be hitting this fool, um, he's gonna be getting a new number soon.  So when he gets the new number, he'll send you a

text. . . .," explaining to the UC that he would start dealing with CHACON from here on out for methamphetamine.  The UC then followed OCHOA and CHACON into the garage.  Upon entering, the UC observed another Hispanic male monitoring a television screen that displayed a security surveillance video system of the area around SUBJECT PREMISES 2.

35.  While in the garage, OCHOA retrieved a red bag from the floor and brought it to the UC.  OCHOA opened the bag and the UC observed a pistol and methamphetamine inside the bag. OCHOA confirmed the pistol in the bag was the same Smith & Wesson pistol OCHOA had on him during the August 21st transaction.  The UC then provided OCHOA $3,300 for the pistol and methamphetamine; $1,100 for the Smith & Wesson[8] pistol and $2,200 for the pound of methamphetamine.

36.  OCHOA then told the UC, "Yeah, anything you want, just, just, he'll take care of you from now on," while pointing at CHACON.  OCHOA then told the UC that OCHOA would provide CHACON the UC'S telephone number and CHACON would contact the UC.  Before the UC departed, OCHOA stayed in the garage while CHACON and the UC walked out to the alley, where CHACON told the UC that CHACON would get the UC'S telephone number from OCHOA. CHACON then provided directions to the UC on how to get back to the freeway from the alley and the UC departed the location.

---

[8] The firearm is fully described as a Smith & Wesson, Model SW40VE, .40 caliber pistol bearing serial number PBU8755.

37.   According to DEA laboratory report, the substance sold by OCHOA was approximately 450.2 grams of 100 percent pure methamphetamine.

38.   Following this transaction, I conducted a query of the serial number on the pistol in NCIC.  I learned that the firearm OCHOA sold the UC had been reported stolen on December 14, 2005 in Los Angeles, California.

F.   **October 5, 2018: OCHOA Sells Methamphetamine to the UC Behind SUBJECT PREMISES 2**

39.   On October 1, 2018, the UC received an incoming telephone call from OCHOA, who was using the "909 number."  This call was recorded.  During the call OCHOA asked the UC if the UC was looking for "work" (a reference to methamphetamine) or those "things" (a reference to firearms).  OCHOA explained the he had methamphetamine he could sell the UC but as for the firearms, "none of those are getting around right now."  When the UC asked if the UC should be going through CAHCON, OCHOA instructed the UC to still go through OCHOA.  The UC arranged to meet OCHOA later in the week to purchase methamphetamine.

40.   On October 5, 2018, OCHOA instructed the UC to meet OCHOA in the alley behind SUBJECT PREMISES 2 to purchase one half pound of methamphetamine from OCHOA.  Once in the alley, the UC was met by OCHOA, who arrived as a passenger in a blue Honda Civic.[9]  OCHOA approached the UC vehicle and opened the passenger door while holding the half pound of methamphetamine

---

[9] According to California Department of Motor Vehicle (CA DMV) records, this Honda Civic is registered to another male at SUBJECT PREMISES 1.

under his shirt.  OCHOA then leaned over the front passenger
seat of the UC vehicle and placed the methamphetamine on the
seat.  When the UC asked if the methamphetamine was coming from
CHACON, OCHOA stated it was not and thought CHACON might not be
around.  The UC provided OCHOA $1,200 for the half pound of
methamphetamine.  OCHOA then returned to the blue Honda Civic as
a passenger and was driven away by the driver.

41.  As the UC prepared to leave the alley behind SUBJECT
PREMISES 2, CHACON came out into the alley and greeted the UC.
CHACON stated that he was unaware that OCHOA was going to meet
the UC in the alley.  While talking about OCHOA, CHACON provided
the UC his telephone number as (562) 351-0590 (hereinafter the
"562 number").  CHACON told the UC that it's easy for CHACON to
obtain methamphetamine from another source.  CHACON then offered
to purchase some of the methamphetamine the UC had just purchase
from OCHOA.  While discussing firearms, CHACON explained that
many people come by his residence and the UC is welcome to stop
by anytime.

42.  According to DEA laboratory report, the substance sold
by OCHOA was approximately 221 grams of 98 percent pure
methamphetamine.

**G.   October 23, 2018: OCHOA Sells the UC a Pistol**

43.  Between October 19, 2018 and October 23, 2018, the UC
conducted a series of recorded telephone calls and text messages
with OCHOA using the "909 number."  These communications
resulted in the agreement for the UC to purchase a 1911-type
pistol from OCHOA in Whittier, California.

44.   On October 23, 2018, the UC, accompanied by another ATF UC, met OCHOA in the parking lot of the Shakey's Pizza restaurant in Whittier, California.   When the UC arrived in the parking lot, the UC called OCHOA on the "909 number" to tell him the UC arrived.   Within minutes, I observed OCHOA exit the warehouse nearby, get into SUBJECT VEHICLE 1 and drive the short distance through the connected parking lots to the UC vehicle. OCHOA parked behind the UC vehicle and honked several times, signaling to the UCs to get into his car.   The UC obliged and entered SUBJECT VEHICLE 1.

45.   Once inside SUBJECT VEHICLE 1, OCHOA pulled an Armscor 9mm pistol[10] from his waistband, ejected the magazine and removed the round in the chamber and the one round loaded in the magazine before showing the firearm to the UC.   OCHOA explained that he had just purchased the firearm so he kept it loaded. When asked if the pistol was new, OCHOA replied, "Brand new, brand, brand, brand, brand new."   OCHOA then handed the pistol to the UC, and the UC in turn paid OCHOA $1,200 for the pistol.

46.   Before leaving, the UC asked OCHOA is he has any more firearms available for sale.   OHCOA explained that he had another one and may end up selling it for $1,000, but if the UC wanted additional magazines and the original box for it then the total cost would be $1,300.   OCHOA told the UC that he would let the UC know a few hours later if he would sell the gun they just

---

[10] The firearm is fully described as an Armscor, Model M1911-A1, 9mm pistol bearing serial number RIA2017843.

discussed.  The UCs then returned to their vehicle, and OCHOA departed in SUBJECT VEHICLE 1 by himself.

47.  An ATF trace of the Armscor pistol purchased by the UC from OCHOA revealed that the pistol had been purchased in Mesa, Arizona on October 3, 2018 (less than three weeks earlier) by an individual other than OCHOA.

**H.   November 14, 2018: CHACON Sells Methamphetamine to the UC**

48.  Between October 16, 2018 and November 14, 2018, the UC conducted a series of recorded telephone calls and text messages with CHACON using the "562 number" to arrange the purchase of one pound of methamphetamine from CHACON at SUBJECT PREMISES 2.

49.  On November 14, 2018, the UC met CHACON at SUBJECT PREMISES 2.  CHACON led the UC into the garage, where another high school aged juvenile male, who CHACON introduced as "Jeffrey" and CHACON'S "strong arm," was present.  CHACON retrieved a yellow plastic bag containing the methamphetamine. CHACON stated to the UC, "This is you right here," while he pointed at the bag.  The UC confirmed that the price was $2,200 and CHACON stated, "Yeah, yeah."  When the UC asked CHACON about the quality of the methamphetamine, CHACON stated, "I haven't tried it . . . It's been good, like lately."

50.  While in the garage, the UC and CHACON discussed firearms and CHACON told the UC that Jeffery "knows a couple of guys that have, have those things."  Jeffrey then told the UC,

"I got a four five with a silencer[11] . . . I have a nineteen eleven[12]. . . ." When the UC indicated interest in purchasing the firearms, Jeffrey told the UC while referring to CHACON, "Let him know, you know, and I got you."

51. The UC then provided CHACON with $2,200 for the methamphetamine. CHACON, in turn, handed the money to Jeffrey and asked him to check it. Before the UC departed, CHACON told the UC that the UC could purchase methamphetamine from CHACON whenever the UC wanted. The UC then asked Jeffrey about the firearms and Jeffrey replied, "The homie and shit from the hood, you know, like we'll always be having like straps[13] and shit . . . as long as you got the money dog, like I got you, you know? And I'll hook it up, you know?" Jeffrey then identified himself as being part of a local criminal street gang. CHACON then walked the UC out to the UC vehicle in the alley and the UC departed the location.

52. According to DEA laboratory report, the substance sold by CHACON was approximately 447 grams of 95 percent pure methamphetamine.

I. **November 19, 2018: CHACON Sells Firearms to the UC**

53. On November 19, 2018, the UC received a series text messages including pictures of a gun from CHACON using the "562

---

[11] I know based on my training and experience that this was a reference to a .45 caliber firearm with an attached silencer or suppressor.

[12] I know based on my training and experience that this was a reference to a Model 1911 type pistol.

[13] I know based on my training and experience that straps is a common term used to refer to firearms.

number" informing the UC that CHACON had two firearms to sell the UC.  The UC agreed to meet CHACON at SUBJECT PREMISES 2 to purchase the firearms.

54.  Hours after receiving the messages from CHACON, the UC traveled to SUBJECT PREMISES 2.  Upon arriving in the alley behind SUBJECT PREMISES 2, CHACON exited his backyard into the alley to meet the UC and led the UC into the garage of SUBJECT PREMISES 2.  On the table in the garage was a Keltec rifle.[14] CHACON told the UC that the rifle was not loaded.  After looking at the rifle, the UC noticed the barrel of a shotgun sticking out of a green canvas bag next to the table.  The UC then handled the shotgun[15] while CHACON asked the UC to return the green canvas bag to him the next time they met.  The UC agreed and placed both the rifle and the shotgun in the bag.  The UC then paid CHACON $1,800 for both firearms.

55.  During the meeting, CHACON informed the UC that Jeffrey has the .45 caliber pistol with the silencer and is willing to sell it.  As the UC prepared to leave SUBJECT PREMISES 2, CHACON asked the UC, "How you doing on like dope? You good right now or?"  The UC told CHACON that the UC would contact CHACON when the UC needed to purchase more methamphetamine.

---

[14] The firearm is fully described as a Kel-Tec, Model SU-16, .223 caliber rifle bearing serial number N4X68.

[15] The firearm is fully described as a Winchester, Model 12, 16-gauge shotgun bearing serial number 1209287.

**J.    December 19, 2018: CHACON Sells the UC Methamphetamine**

56.    Between November 21, 2018 and December 19, 2018, the UC engaged in a series of recorded telephone calls and text messages with CHACON using the "562 number" to discuss the potential sale of methamphetamine and firearms by CHACON to the UC.

57.    On December 17, 2018, the UC received a text message from CHACON, who was using the "562 number", that stated in coded language that the price of methamphetamine was going to increase.  CHACON explained, "I know it's shity Buddy and it's no way my call dude it's just not up to me again I apologize for interrupting you.  Thanks.  ill speak to u later."  Following this message, the UC agreed over text messages to/from the "562 number" to purchase one half pound of methamphetamine from CHACON for $1,400.

58.    On December 19, 2018, the UC traveled to SUBJECT PREMISES 2 to purchase the methamphetamine.  Upon arriving, CHACON met the UC in the alley.  The UC returned the green canvas bag that CHACON provided the UC on November 19th, 2018 and the two walked to the garage.  Once inside, CHACON told the UC that the UC would have to wait a few minutes for the methamphetamine to arrive.  While waiting, CHACON told the UC that this methamphetamine was coming from a different source than the methamphetamine the UC purchase on November 14th, 2018.  During this time CHACON stated that he regularly talks to OCHOA.

59.    After a few minutes, CHACON received a telephone call in the presence of the UC.  CHACON then ended the call and told

the UC that the person bringing the methamphetamine was about to arrive. Around this same time, I observed a vehicle that appeared to be the SUBJECT VEHICLE arrive in the alley behind SUBJECT PREMISES 2. I also observed CHACON come out of the backyard into the alley and walk up to the vehicle. Minutes later, CHACON returned to the garage and the vehicle left the alley. When CHACON returned to the garage he handed the UC a clear bag containing the half pound of methamphetamine. CHACON asked the UC if the UC wanted to use CHACON'S scale to weigh it but the amount of narcotics was too large to balance on the scale. CHACON then explained the source of the methamphetamine to the UC by saying, "Well not from the same dude . . . I mean like, the people I'm getting it from, they getting it from, I'm getting it from the same person I got it from. They, they have another source." The UC then provided CHACON with $1,400 for the methamphetamine and left SUBJECT PREMISES 2.

60. Approximately four minutes after the UC left, I observed the SUBJECT VEHICLE arrive again in the alley behind SUBJECT PREMISES 2. I then observed CHACON come out and stand by the vehicle, appearing to be speaking to the driver who remained in the vehicle. After a few minutes, I observed the SUBJECT VEHICLE drive away and I identified OCHOA as the driver and sole occupant of the vehicle.

61. Based on my training and experience, this activity was consistent with OCHOA delivering methamphetamine to CHACON and then returning to retrieve payment for the methamphetamine after CHACON sold the methamphetamine to the UC.

62. According to DEA laboratory report, the substance sold by CHACON was approximately 222.49 grams of 97 percent pure methamphetamine.

**K.   January 7, 2019: CHACON Sells the UC a Pistol**

63. On January 3, 2019, CHACON, using the "562 number", sent a text message to the UC stating "Hey buddy sorry I've been off the grid for a couple days my phone brokea broke. Had to buy a new one. anyhow i got something 4 you. Its different n new how we like. Still 14. come ck it out." Less than an hour later, CHACON sent the UC another text message clarifying in coded language that CHACON was referring to a firearm and not methamphetamine in his previous text message. Eventually CHACON sent the UC pictures of two different firearms for sale, one being an HS Products, Model XD45 pistol.

64. On January 7, 2019, the UC traveled to SUBJECT PREMISES 2 to purchase a firearm from CHACON. Upon arriving in the alley, CHACON met the UC and led the UC into the backyard and ultimately into the garage. Once in the garage, CHACON stated to the UC, "I'm authorized to sell you one envelope." The UC observed a plastic bubble-wrapped envelope on a cabinet in the garage. CHACON told the UC, "Go for it, check it out." The UC opened the envelope and pulled out an HS Products, Model XD45 pistol.[16] When the UC asked what happened to the other pistol that CHACON had sent a picture message of, CHACON

---

[16] This firearm is fully described as an HS Products (IM Metal), Model XD45, .45 caliber pistol bearing serial number S3224691, imported by Springfield Armory.

explained that the source of that firearm decided that he no longer wanted to sell it.

65.   The UC then provided CHACON $1,400 for the pistol and left the location.

## L.   CHACON'S Criminal History

66.   I have reviewed CHACON'S criminal history and learned that he has the following felony convictions:

a.   May 11, 2004: Petty theft with priors (Los Angeles County, California; VA082553);

b.   January 31, 2008: Petty theft with priors (Los Angeles County, California; VA104153);

c.   March 19, 2008: Petty theft with priors (Los Angeles County, California; VA104633); and

d.   February 8, 2012: Burglary (Los Angeles County, California; VA123458).

## M.   OCHOA'S Criminal History

67.   I have reviewed OCHOA'S criminal history and learned that he has suffered the following felony convictions:

a.   May 13, 2103: Possession of a controlled substance (Los Angeles County, California; VA129319);

b.   January 23, 2015: Possession of a controlled substance for sale (Los Angeles County, California; VA135319);

c.   June 29, 2017: Possession of a controlled substance for sale (Los Angeles County, California; VA144793)

68.   During a 2017 arrest, OCHOA provided the Los Angeles County Sheriff's Department his address as SUBJECT PREMISES 1 including that he has lived there for 20 years.

**N.   CA DMV Query**

69.   According to California DMV records, OCHOA provided his address of record as SUBJECT PREMISES 1 on December 11, 2018.

70.   According to California DMV record, CHACON provided his address of record as SUBJECT PREMISES 2 on June 20, 2018.

**O.   Federal Firearms Licensing Inquiry**

71.   Based on ATF licensing system queries performed on January 14, 2019, I learned that neither OCHOA nor CHACON currently nor have they ever held a federal firearms license allowing them to engage in the business of dealing firearms.

**P.   Training and Experience Regarding Evidence of Firearms and Narcotics Trafficking in a Trafficker's Residence**

72.   Based on my training and experience, I know that individuals engaged in the illegal sales of firearms and narcotics often keep records and evidence of such conduct at their residences.  Such evidence can be found in the form of, but not limited to, the following items:  pictures, receipts, handwritten ledgers (e.g., pay-owe sheets), gun cases and original boxes, and cellular telephones.  Since the residences are where these individuals often spend the most time, it is common to find evidence of their illegal activity there.

73.   Additionally, in this investigation, on more than one occasion, the sale of firearms and narcotics as detailed above occurred at the SUBJECT PREMISES.  For that reason, I believe OCHOA and CHACON likely maintain items for sale, or evidence related to items for sale, inside of the SUBJECT PREMISES.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

74.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

- 25 -

form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

75.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so

many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

76.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after

a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

       c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ROBERT OCHOA and MARCOS CHACON's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of ROBERT OCHOA and MARCOS CHACON's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

      77. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

/// 

///

///

## VII. CONCLUSION

74.   For the reasons set forth above, I respectfully submit their is probable cause to believe that OCHOA and CHACON have violated 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) by distributing methamphetamine, and that evidence of violations of that statute as well as certain other federal firearms statutes may be found at OCHOA's and CHACON's residence and the SUBJECT VEHICLE.

Ryan J. Stearman
Special Agent, ATF

Subscribed to and sworn before me this __15__ day of February 2019.

~~AUTUMN D. SPAETH~~
UNITED STATES MAGISTRATE JUDGE

KAREN E. SCOTT

- 29 -

## ATTACHMENT A-1

<u>PREMISES TO BE SEARCHED</u>

The residence located at 8308 Morrill Avenue, Whittier, California ("SUBJECT PREMISES 1"), including all rooms, attics, basements, any places located therein, and any porches, balconies, garages, carports, storage rooms, containers, and outbuildings specifically on the premises property, associated with, or assigned to, the residence, and any vehicles parked in the garage or driveway specifically associated with, or assigned to, the residence.

The SUBJECT PREMISES is further described as a single-story structure with light-colored siding and a tan composite roof, with a driveway leading to a detached garage on the north side of the house. It is a single family residence located at the end of a cul-de-sac, on the east side of Morrill Avenue. The numbers "8308" are painted on the curb directly in front of the residence.

- 1 -

## ATTACHMENT A-2

PREMISES TO BE SEARCHED

The residence located at 11127 Wheelock Street, Whittier, California ("SUBJECT PREMISES 2"), including all rooms, attics, basements, any places located therein, and any porches, balconies, garages, carports, storage rooms, containers, and outbuildings specifically on the premises property, associated with, or assigned to, the residence, and any vehicles parked in the garage or driveway specifically associated with, or assigned to, the residence.

The SUBJECT PREMISES is further described as a single-story structure with gray siding and a gray composite roof. It is a single family residence located on the north side of Wheelock Street, and the third house west of Millergrove Drive. The numbers "11127" are painted on the curb directly in front of the residence. There is an alley directly to the north of the residence which runs between Danby Avenue and Millergrove Drive.

**ATTACHMENT A-3**

PREMISES TO BE SEARCHED

A silver 2013 Honda Civic sedan, with California license plate 7BTL760, and Vehicle Identification Number 19XFB2F5XDE244173

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a license); 21 U.S.C. § 846 (conspiracy to distribute controlled substances); and 21 U.S.C. § 841(a)(1) (distribution of controlled substances) (the "Subject Offenses"), namely:

a.   Firearms and ammunition;

b.   Controlled substances, packaging, scales, pay/owe sheets, or any other indicia of controlled substance trafficking;

c.   Firearms accessories, parts, and parts kits, including upper receivers, barrels, trigger mechanisms, stocks, holsters magnets, bullet button locks, sights, forward pistol grips, and bi/tripods;

d.   Finished and unfinished firearm lower receivers;

e.   Items used for the storage or display of firearms, including but not limited to display cases, safes, and other storage containers;

f.   United States currency over $1,000, bearer instruments worth over $1,000 (including cashier's checks and traveler's checks);

g.   Records, books, receipts, pay-owe sheets; ledgers; customer forms and other papers relating to the

purchase, registration, manufacture, distribution, sale, or barter of firearms or controlled substances;

      h.   Communications regarding the sale or distribution of firearms or controlled substances;

      i.   Documents or other items showing occupancy, ownership, or rental of the SUBJECT PREMISES, including addressed envelopes, utility bills, telephone bills, rent receipts, keys, or items with labeled or personalized names (not to exceed ten such items);

      j.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

      k.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

        iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.   records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

- 7 -

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, law enforcement is permitted to: (1) depress ROBERT OCHOA and MARCOS CHACON's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct

- 10 -

which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of ROBERT OCHOA and MARCOS CHACON's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

    7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.